J-A31012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: A.W., A MINOR : IN THE SUPERIOR COURT OF
                                  :       PENNSYLVANIA
                                  :
APPEAL OF: D.W., MOTHER           :       No. 2031 EDA 2017

Appeal from the Order Entered May 30, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0032309-2010

BEFORE:  PANELLA, J., and OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY PANELLA, J.          **FILED FEBRUARY 02, 2018**

D.W. ("Mother") appeals the order of the Court of Common Pleas of Philadelphia County, entered May 30, 2017, that temporarily suspended Mother's supervised visitation with her son A.W. ("Child"), born in July 2009, pending the implementation of therapeutic visits.[1] We affirm.

Child has been in foster care since March 2010, when Mother, a minor at that time, and Child resided at People's Emergency Center. Philadelphia's Department of Human Services ("DHS") obtained an Order of Protective Custody and placed Child in foster care on March 15, 2010, after learning Mother had left Child in the care of another minor resident of the Center while she went to school. Mother had unsupervised visits with Child until September 2016, when visits were modified to line-of-sight/line-of-hearing supervised visits at the agency.

---

* Former Justice specially assigned to the Superior Court.

[1]  The order also requires Mother to stay away from a certain caseworker, but Mother does not contest that part of the order.

DHS filed an application for an emergency permanency review hearing on April 27, 2017, in which it sought a stay-away order against Mother to protect the Community Umbrella Agency case manager, Jazzmine Mowatt, and a change in visits between Mother and Child. The trial court approved the request and the hearing took place on May 30, 2017.

Ms. Mowatt was the first witness to testify at the hearing. She had been the family's case manager for almost three years. She stated DHS was seeking a stay-away order, on her behalf, against Mother after Mother threatened her at a hearing. Ms. Mowatt testified a security guard had to escort her to her car because Mother followed, harassed, and verbally threatened her as she left court. Ms. Mowatt thought the impetus behind Mother's behavior toward her was that Child's goal had been changed to adoption.

The incident outside the courtroom caused her to feel unsafe around Mother. She discussed her concerns and her possible removal from the case with her supervisor; however, it was determined that she would remain as case manager because she has a bond with the Child, and Child would be adversely affected if she were removed from the case.

Ms. Mowatt also had concerns about Mother's behavior toward Child. She related how Child had acted up at home after a visit with Mother on May 6, 2017, when Mother referred to Child as "spoiled" and called him "fat."

2

Because of those disparaging remarks, Child told his foster mother that he needed to work out because he was overweight.

Mother engaged in other behaviors that negatively affected Child. She recalled an incident of domestic violence between Mother and her boyfriend in which police were called and about which Child expressed fears to his therapist. Ms. Mowatt testified she did not believe that suspending Mother's visits would have a negative effect on Child, explaining that Child has a bond with and feels safe with his foster mother and is calmer without Mother's negative influence.

In response to questions from the Child Advocate, Ms. Mowatt stated that Mother refused to abide by Agency rules during supervised visitation, refused to clean up after herself, and was uncooperative with agency staff.

On cross-examination by Mother's attorney, Ms. Mowatt noted that, although Mother had had unsupervised visits with the Child since he was eight months old, "She's had supervised for quite some time now." And she explained that a visitation coach is assigned to every visit and that they tell her that Mother is hostile toward them and uncooperative.

Quincy Marshall, a visitation coach for Turning Points for Children, testified that the visits he observed had been appropriate, and that there were no issues regarding Mother's behavior during the visits.

Janet Cotton, Child's trauma therapist, testified she had concerns about Mother's visits and recommended the visits cease. Ms. Cotton stated

the Child began to experience self-esteem issues following the early May visit with Mother when she referred to him as "fat" and "spoiled." She related how he had begun to display regressive behavior, such as urinating on items in his foster mother's home. He had also begun to exhibit risk-taking and self-harming behaviors, such as hanging out of a car window, going face first down a flight of stairs, and shoving tissues so far up his nose that he damaged his mucus membranes. Ms. Cotton recommended visitation stop because it is a threat to Child's emotional and physical well-being.

Ms. Cotton further testified Child has undergone a psychological evaluation to address these concerns, and that she was in the process of implementing services to help him become more stable in the foster home. Ms. Cotton stated that in all the years that she has worked with Child, she has never before seen this type of behavior from him. When asked by the court what she believed was the event that may have triggered Child's change in behavior, Ms. Cotton replied it was the visits in which Mother was disrespectful toward the agency staff in front of the Child, and after she made the negative comments to him about being "spoiled" and "fat." Ms. Cotton further related how behavior toward his foster parent significantly worsened, becoming defiant and aggressive after this visit with Mother.

Ms. Cotton was unable to provide a timeframe for how long the suspension of visits would last, explaining it would depend on the length of time it would take to stabilize Child. In response to a question by the Child

4

Advocate, Ms. Cotton answered Mother had not been actively involved in Child's therapy, and that she would have to prepare and meet with her individually before she could begin joint sessions with Child. Ms. Cotton explained Child is in a loyalty bind between caregivers. And that bind precludes permanency and stability in his life.

Mother was the last witness to testify. She gave a different account of the incident with Ms. Mowatt after the last court hearing. She claimed she merely approached Ms. Mowatt to ask her what was going on with the case, and that Ms. Mowatt responded by telling her to get out of her face, and claiming that she was threatening her. Mother denied threatening Ms. Mowatt. Mother also stated she had been trying to have Ms. Mowatt removed from the case, but her supervisor denied her multiple requests. She asked for the removal because she was never able to get in contact with, or have a timely response from Ms. Mowatt. She claimed that when Ms. Mowatt did respond, it was with aggression or attitude toward her.

At the conclusion of the hearing, the trial court found Ms. Cotton to be credible and Mother to be not credible.

The trial court entered the order complained of, which suspended Mother's visitation with Child and ordered Mother to stay away from Ms. Mowatt. Mother timely filed her notice of appeal and concise statement of errors complained of on appeal.

Mother presents the following questions for our review:

A. Whether the court erred in suspending Mother's visits with [Child], when there was no evidence or testimony that there was a grave threat to [Child].

B. Whether the errors committed by the [court] deprived [Mother] of her rights to due process and equal protection under the law.

Mother's Brief, at 3.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Our review of the record in this matter reveals DHS presented sufficient evidence to support the court's order of a "temporary restriction of Mother's visits, until she could be integrated into therapeutic visits as soon as they can be arranged by Janet Cotton, Trauma Therapist." Trial Court Opinion, 9/18/17, at 20.

After examining the record, the briefs, and the court's opinion, we are satisfied the opinion is a correct and thorough analysis of the issues raised by Mother in her appeal. Accordingly, we affirm the court's order entered May 30, 2017, based on the comprehensive and well-written opinion of the Honorable Allan L. Tereshko, Sr.

Order affirmed.

6

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/2/18

## THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
## IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| **IN THE INTEREST OF:** | **: FAMILY COURT DIVISION** |
| | **: JUVENILE BRANCH-DEPENDENCY** |
| | : |
| **A.W., a Minor** | **: CP-51-DP-0032309-2010** |
| **d/o/b: 07/10/2009** | : |
| | : |
| **Appeal of:** | **: Superior Court No. 2031 EDA 2017** |
| **D.W., Mother** | : |

## O P I N I O N

D.W., ("Mother"), Appeals from the Permanency Review Order entered by this

Court on May 30, 2017, suspending Mother's visitation with her Child, a male, A.W.,

(d/o/b July 10, 2009).

After a Permanency Review Hearing on May 30, 2017, this Court found that clear

and convincing evidence was presented to suspend Mother's visitation with the Child,

A.W. In response to the Order of May 30, 2017, Mother, by and through her counsel,

filed a Notice of Appeal with Statement of Matters Complained of on Appeal on June 28,

2017.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matter Complained of on Appeal, Mother raises the following issues:

1. The Trial Court erred in suspending Mother's visits with her
   Child, when there was no evidence or testimony that there was
   a grave threat to the Child.
2. The errors committed by the Court below deprived appellant of
   her rights to due process and equal protection   under the law.
3. Permission is respectfully requested to submit additional
   ISSUES OR ERRORS in support of the within APPEAL as
   shall appear after REVIEW OF THE TRANSCRIPT is
   completed.

1

## PROCEDURAL HISTORY

On March 11, 2010, the Child's minor Mother, D.W., was placed at People's Emergency Center. The Child remained in the care of his Mother, who was instructed not to leave him in the care of any resident. (Dependency Petition, 3/18/2010, ¶ "b").

On March 15, 2010, Mother left the Child in the care of another teen resident and stated that she was going to school. DHS was paying for the Child to attend daycare in the area and Mother did not take the Child to daycare. DHS contacted the school and learned that Mother was marked present for the day; however, she was absent from there following two classes. (Dependency Petition, 3/18/2010, ¶ "c").

On March 15, 2010, the Department of Human Services (DHS), filed an Order of Protective Custody (OPC) for the Child and placed him in a foster care home through Catholic Social Services. (Dependency Petition, 3/18/2010, ¶ "d").

On March 15, 2010, DHS called the Adolescent Initiative Center (AIC) and spoke to Mother. Mother came to DHS to obtain a copy of the OPC. DHS recommended Mother attend parenting classes and therapy and she agreed to the recommendations. (Dependency Petition, 3/18/2010, ¶ "e").

J.F. is the Child's Father, and his whereabouts were unknown to DHS. (Dependency Petition, 3/18/2010, ¶ "h").

On March 17, 2010, a Shelter Care Hearing was held before Master Zlotowski. An order was issued for the Child to continue at Catholic Social Services foster home, and Mother to continue at the People's Emergency Shelter. The OPC was lifted. Mother attends AIC Program, and she is to complete parenting classes and therapy. Mother to

2

have at least one overnight visit at the Shelter prior to adjudication. (Shelter Care Order, 3/17/2010).

A Dependency Petition was filed by DHS on March 18, 2010, and an Adjudicatory Hearing was held before the Honorable Donna Woelpper on March 26, 2010. The Court adjudicated the Child Dependent and committed to DHS, with Child at Catholic Social Services Foster Home, based on present inability of Mother to complete parenting and therapy. Mother to have unsupervised overnight visits with Child as arranged by the parties at the Shelter. (Adjudicatory Hearing and Order, 3/26/2010).

A Permanency Review Hearing was held before the Honorable Donna Woelpper on August 3, 2010. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child to continue. Mother has bi-weekly supervised visits with the Child in the foster home. Visits may be further modified by agreement of the parties. Minor Mother is placed at St. Mary's Villa. DHS to make referral for Mother and Child for family school. (Permanency Review Order, 8/03/2010).

A Permanency Review Hearing was held before the Honorable Flora Barth Wolf on December 10, 2010. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child to continue. Child is doing well and attends family school. Minor Mother residing at St. Mary's Villa. DHS exploring Mother/Baby Placement, and Child may be moved with Mother to that placement. DHS to assist minor Mother with academic progress. Assistant City Solicitor to do a PLS on prison search for Father. (Permanency Review Order, 12/10/2010).

A Permanency Review Hearing was held before the Honorable Flora Barth Wolf on May 11, 2011. The Court ordered the legal custody of the Child to remain with DHS,

3

and placement for the Child to continue through Catholic Social Services. DHS to make a referral for a Mother/Baby Program without the evaluation. Mother attends the On-Ground School at St. Mary's. Mother has weekly visits at the foster home. (Permanency Review Order, 5/03/2011).

A Permanency Review Hearing was held before Juvenile Court Hearing Officer Tammy Langenberg, on September 11, 2011. An Order was issued that the legal custody of the Child to remain with DHS, and placement for the Child to continue. Mother to have liberal unsupervised community day visits with Child, visits may be further modified by agreement of the parties. (Permanency Review Order, 9/20/2011).

A Permanency Review Hearing was held before the Honorable Thomas M. Nocella on March 20, 2012. The Court ordered the legal custody of the Child to remain with DHS. Placement of the Child to remain in Foster Care through Catholic Social Services. Child is doing well, is developmentally on target and not in need of therapeutic services. It was noted, Mother is a minor and Father's whereabouts are unknown. (Permanency Review Order, 3/20/2012).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, Carol A. Carson on June 8, 2012. An Order was issued that the legal custody of the Child to remain with DHS, and placement for the Child to continue. Child is developmentally on target. Mother's visits are modified to weekly, supervised visits in the caretaker's home, and can be further modified by agreement of the parties. (Permanency Review Order, 6/08/2012).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, Carol A. Carson on September 7, 2012. An Order was issued that the legal

4

custody of the Child to remain with DHS, and placement for the Child to continue. Mother to continue to have unsupervised community day visits. Child is doing well and developmentally on target. All medicals and immunizations are up to date. Mother graduated from High School and has begun Pierce College. (Permanency Review Order, 9/07/2012).

A Permanency Review Hearing were held before the Juvenile Court Hearing Officer, Carol A. Carson on December 6, 2012. An Order was issued that the legal custody of the Child to remain with DHS, and placement for the Child in foster care to continue. Child may be reunified with Mother upon approval of CCIS, discharge plan meeting prior to discharge. (Permanency Review Order, 12/06/2012).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, Carol A. Carson on March 7, 2013. Order issued that the legal custody of the Child to remain with DHS, and placement for the Child in foster care to continue. Child is doing well and developmentally on target. Mother is enrolled at Pierce College and scheduled to begin attending classes on March 13, 2013. Mother lost SIL (Supervised Independent Living) Housing due to an arrest and a preliminary hearing is scheduled. Mother is currently placed at a Pathways Shelter. Mother referred to BHS for outpatient therapeutic services. DHS to refer Mother to parenting classes that do not conflict with her college schedule. (Permanency Review Order, 3/07/2013).

Mother was arrested on January 1, 2013 for Aggravated Assault, Possession of Instrument of Crime, Simple Assault, and Reckless Endangering Another Person. All charges were Withdrawn on March 13, 2013. (Secure Court Summary, PID#1132325).

5

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on May 21, 2013. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child in foster care to continue. Mother's therapy through Med-Net continues, unsupervised day visits with Child continue. Mother's visits may be further modified to overnight prior to next court date. (Permanency Review Order, 5/21/2013).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on August 20, 2013. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and attending pre-school at the Clara Barton Elementary School. Mother is a full-time student at Pierce College, and is due to begin attending parenting and therapeutic sessions. Mother re-referred to BHS. Mother's visits to continue as weekly, supervised visits in the caretaker's home, and in addition, overnight visits to occur. (Permanency Review Order, 8/20/2013).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on November 19, 2013. The Court ordered the legal custody of the Child remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is not receiving any special services and is in pre-kindergarten. Mother is currently open with DHS and resides in an SSIL. DHS to go forward with concurrent plan of PLC for the Child. DHS is to conduct a PLS on Father, and contact Legal Liaison once an updated address is obtained for Father. Mother has weekly, unsupervised overnight visits with the Child, and will continue as arranged. (Permanency Review Order, 11/19/2013),

6

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on February 18, 2014. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and attending kindergarten at the Child Learning Center. Minor Mother is placed in an SIL Placement through Pathways. J.F.. Father, is incarcerated at Graterford Prison. Mother's visits to continue as weekly, weekend, unsupervised overnight visits as arranged by the parties. (Permanency Review Order, 2/18/2014).

A continuance was granted on May 6, 2014 by the Honorable Kevin M. Dougherty. No action taken. Case continued due to unavailability of Judge. (Continuance Order, 5/06/2014).

A Permanency Review Hearing was held before the Honorable Jonathan Q. Irvine on June 4, 2014. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and not receiving any special services at this time. Child will be graduating from Pre-School. Minor Mother continues in DHS care, and is referred for a Parenting Capacity and Bonding Evaluations. Court orders paternity test for J.F. Mother's visits to continue as weekly, weekend, overnights. (Permanency Review Order, 6/04/2014).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer Alexis Ciccone on September 3, 2014. It was ordered that the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and will be attending Clara Barton Elementary School. Child has weekly, weekend, unsupervised visits with Mother. Mother is currently 4 months pregnant. She has completed the first part of the Parenting Capacity

7

Evaluation; second part pending on 10/20/2014. Father is currently incarcerated at SCI, Coal Township. Father has been identified by paternity, and has no contact with the Child. (Permanency Review Order, 9/03/2014).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on November 19, 2014. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and attending Clara Barton School. Child is up-to-date with medicals and dentals. Mother is currently not attending therapy but has an appointment scheduled for 11/28/2014 through JFK. Mother completed second part of Parenting Capacity Evaluation on 10/20/2014. Mother's Bonding Evaluation was completed on 11/10/2014. DHS to implement recommendations of PCE and Bonding Evaluations. DHS to forward copies of CCTC, PCE and Bonding Evaluation to all counsel. Child referred to CCTC. Paternity test determined J.F. as the Father. Mother's visits to continue as weekly, weekend, unsupervised overnight visits. (Permanency Review Order, 11/19/2014).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko on February 11, 2015. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is doing well, and attending Clara Barton School. Child referred for an evaluation through CCTC. Mother completed the Parenting Capacity Evaluation/Bonding Evaluation. DHS has submitted the PLC waiver. Mother's visits to continue as weekly weekend unsupervised overnight visits. (Permanency Review Order, 2/11/2015).

A continuance was granted on May 15, 2015, by the Honorable Margaret T. Murphy. Child is in Progressive Life Foster Home. Remain as committed. (Continuance Order, 5/15/2015).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko, on June 5, 2015. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child receives therapeutic services. Mother to sign releases. An FSP meeting is to occur prior to the next court date. Child may be reunified with Mother, prior to the next court date, by agreement of DHS and Child Advocate. Mother's unsupervised overnight visits shall continue. (Permanency Review Order, 6/05/2015).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, William T. Rice on September 3, 2015. It was ordered that the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is referred to BHS for an evaluation. Mother is to comply with recommendations of Parenting Capacity Evaluation/Bonding Evaluation, and Single Case Plan Objectives. Mother's biweekly visits to continue. (Mother is to be only caregiver to Child during visitation), and may be modified to weekend overnight by order of the Court. (Permanency Review Order, 9/03/2015).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko, on December 3, 2015. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is having some behavioral issues in the home and in school. Child attends first grade at Hamilton Elementary School. Child has completed sex abuse

9

trauma therapy through Children's Hospital of Philadelphia (CHOP) on 11/18/2015. Trauma focused therapy has been recommended. Child is medically up-to-date. Mother completed the Parenting Capacity Evaluation/Bonding Evaluation. Mother attends individual therapy through Dunbar, and is currently employed full time. Father has not made himself available to DHS. Once Mother secures appropriate and stable housing, Child may be reunified with Mother through Administrative Order by agreement of the parties. Mother is referred to BHS for consultations and/or evaluations. Mother to sign releases. Mother's visits to continue as arranged. (Permanency Review Order, 12/03/2015).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, Carol A. Carson on 3/03/2016. It was ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child attends first grade at Hamilton Elementary School, and is attending CCTC weekly for therapy. Mother to re-engage in therapeutic service, and re-referred for an updated PCE. Supplement of Bonding Evaluation to be done. CUA to do a home assessment of Mother's new home at 121 N. Ruby St., Phila. PA 19139. If Mother's home is appropriate, Child shall have overnight weekends at Mother's home. Mother to reach out to Child's therapist to determine if she should participate in sessions. (Permanency Review Order, 3/03/2016).

A Continuance was granted by the Honorable Allan L. Tereshko, on June 2, 2016. Child is to remain as committed. CUA is to submit a safety affidavit to the Court in 7 days. (Continuance Order, 6/02/2016).

10

A Continuance was granted by the Honorable Allan L. Tereshko on August 8, 2016. Child is to remain as committed. (Continuance Order, 8/08/2016).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko, on September 15, 2016. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is medically up-to-date, and has been displaying physical aggression. He attends CCTC for therapy. Mother referred for relationship therapy. Therapeutic visits are to be implemented between Mother and Child. Mother is to attend the caregiver session at CCTC, and sign releases and consents. Mother is to attend the Bonding Evaluation, and is referred to BHS for consultation and/or evaluation. Mother is to have weekly line of sight/line of hearing, supervised visits with the Child at the Agency. Father is to have line of sight/hearing supervised visits with the Child at the Agency, when he avails himself and at the recommendation of the Child's therapist. (Permanency Review Order, 9/15/2016).

A Continuance was granted by the Honorable Allan L. Tereshko on December 15, 2016. Case continued as Child Advocate failed to appear. (Continuance Order, 12/15/2016).

A Permanency Review Hearing was held before the Juvenile Court Hearing Officer, Carol A. Carson on January 26, 2017. It was ordered the legal custody of the Child to remain with DHS, and placement for the Child through Progressive Life Center to continue. Child is receiving trauma therapy through CCTC. Child is on the honor roll at Hamilton Elementary School. Mother was referred for relationship therapy at Dunbar, and she attended the first part of the Parenting Capacity Evaluation. CUA to assist

11

Mother with scheduling second part of PCE. Bonding Evaluation to be scheduled upon completion of PCE, and Mother shall attend. DHS/CUA to assist Mother with housing referrals, and to follow up with therapeutic visitation and make referral. Mother to attend caregiver sessions, and is referred to BHS for monitoring. Mother is to continue weekly line of sight/hearing supervised visits with the Child at the Agency. Mother to confirm visits 24 hours in advance, and her visits are to be on Saturdays. Father is to have line of sight/hearing supervised visits with the Child at the Agency, when he avails himself and at the recommendation of the Child's therapist. (Permanency Review Order, 1/26/2017).

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko, on April 20, 2017. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child shall remain in a pre-adoptive home through Turning Points. Child is receiving therapy through CCTC. Remain as committed. PLS is ordered for Father. (Permanency Review Order, 4/20/2017).

A Request for an Emergency relisting was filed by Taniesha Clement, Attorney for DHS on April 27, 2017. This request was approved by Honorable Allan L. Tereshko on May 4, 2017, and listed for May 11, 2017. Notice provided to all parties. (Request for Emergency relisting 4/27/2017).

A Status Review Hearing was held on May 11, 2017 before the Honorable Allan L. Tereshko. Child continues to reside in foster care through Turning Points for Children. DHS commitment to stand. Case remains status quo. No action taken, and Continuance granted for further testimony. All prior orders are to stand. (Status Review Order, 5/11/2017).

12

A Permanency Review Hearing was held before the Honorable Allan L. Tereshko, on May 30, 2017. The Court ordered the legal custody of the Child to remain with DHS, and placement for the Child shall remain in Foster Care through Turning Points for Children. Child to continue therapy and Mother to be incorporated into Child's therapy when appropriate. All Communication shall be in writing to and from. The Court issues a Stay Away Order as to Mother, to stay away from CUA worker, Jazzmine Mowatt. Child to remain as committed. (Permanency Review Order and Dependency Court Protective Order, 5/30/2017).

The next scheduled court date is a Contested Permanency Review Hearing scheduled for August 29, 2017.


## PERMANENCY REVIEW HEARING

This Court held a Permanency Review Hearing on May 30, 2017. Taniesha Clement, Counsel for DHS, stated the Agency requested an Emergency Relist in the Child's interest and requested a Stay-Away Order and to cease the visitation between Mother and Child. This request was contested by Mother. Mother appeared at the hearing and was represented by counsel, Athena Dooley. (N.T., 5/30/2017, p.6 at 2-17).

Jazzmine Mowatt, the CUA Case Manager for Turning Points for Children, was the first witness to testify. She stated that the Agency, on her behalf, is seeking a Stay-Away Order against the Child's Mother after she threatened her at the last hearing held on April 28, 2017. Ms. Mowatt stated she had to be escorted by a security guard to her car because Mother was waiting outside of the elevators for her, and verbally harassed her. (N.T., 5/30/2017, p.8 at 4-25).

13

She stated she has been the Case Manager for almost three years, however, now she feels unsafe around Mother. She further stated a discussion with her Supervisor ensued regarding her removal from the case, however, she is to remain as Case Manager. She states the Child may suffer in some way if she is removed from the case. (N.T., 5/30/2017, p.9 at 7-18; p.10 at 2-22).

Ms. Mowatt further testified she also had concerns about Mother's behavior as to the Child. The Child had been acting up at home, after a visit with Mother on May 6, 2017, when Mother referred to the Child as spoiled and called him fat. And because of that the Child had issues at home with the foster mother, stating he needed to work out because he was overweight. She noted the Child has been in placement for almost eight years. (N.T., 5/30/2017, p.11 at 18-25; p.12 at 1-17).

Ms. Mowatt further testified that Mother engaged in other behaviors that had a negative effect on the Child. Specifically, she recalled an incident of domestic violence between Mother and her paramour in which police were called and the Child expressed fears to his therapist. Based on these concerns, she opined that suspending the Mother's visits with the Child will not affect the Child negatively. He is bonded with his foster parent, feels safe, and is calmer without Mother's negative comments. (N.T., 5/30/2017, p.12 at 19-25; p.13 at 1-13).

On cross-examination by Timothy McCollough, Child Advocate, Ms. Mowatt noted that the Mother refused to abide by Agency rules to clean up after herself and is uncooperative with the Agency staff. She stated the negative interaction with Mother after the last court date was likely because Mother first learned that the goal for the Child

14

was changed to adoption. She further noted that Mother is not a threat to the Child. (N.T., 5/30/2017, p.14 at 4-25; p.15 at 1-16).

On cross-examination by Athena Dooley, counsel for Mother, Ms. Mowatt noted Mother had unsupervised visits with the Child since he was eight months old, however, the visits were changed to supervised quite some time ago. She testified there is a visitation coach assigned at every visit, and they related to her that Mother was hostile to them and uncooperative. Further, she stated that Mother's name calling to the Child is harmful. (N.T., 5/30/2017, p.16 at 11-25; p.17 at 1-20).

Quincy Marshall, Visitation Coach for Turning Points for Children, was the next witness to testify. He noted that he observed visitations between Mother and the Child, and the visits have been appropriate and there were no issues regarding Mother's behavior during the visits. (N.T., 5/30/2017, p.20 at 8-23).

Janet Cotton, CCTC Trauma Therapist, was next to testify. She had concerns related to Mother's visitations and recommended that visits cease at this time. Since the Child's visit with Mother the first weekend in May, the Child has also been experiencing some self-esteem issues following his visit with Mother, and her referring to him as being fat and spoiled. He has also been exhibiting risk-taking behaviors such as self-harming, hanging out of a car window, going face first down a flight of stairs, and shoving tissues so far up his nose that it is damaging his mucus membranes. His medical doctor ruled out any medical causes for his urinating behavior. She opined that the visits with Mother are a threat to the Child's emotional and physical safety at this time. The Child also attended a psychiatric evaluation recently, and CTSS stabilization services were requested to have someone come out to the foster home and help stabilize him. She further recommended

15

the Child be placed on medication management, however, is concerned that Mother may be unwilling to sign for the medications, as she has done in the past. (N.T., 5/30/2017, p. 21 at 21-25; p.22 at 1-25; p.23 at 1-16).

Ms. Cotton further testified she is concerned about the Child's emotional harm and his physical wellbeing. She has never seen this behavior in the Child since she has worked with him. After the visit with Mother when he observed her being disrespectful to the staff and after Mother made the negative comments to him, he was defiant and aggressive with his foster parent as well. She seeks stoppage of the visits with Mother, but was unable to give a timeframe for the length of the cessation. She believes it is a way to stabilize the Child at this time. (N.T., 5/30/2017, p.23 at 17-25; p.24 at 1-25).

On cross-examination by Timothy McCullough, Child Advocate, Ms. Cotton stated the Child was diagnosed with adjustment disorder and anxiety. And it was recommended that the Child would benefit from anxiety medication. Ms. Cotton stated Mother has not been actively involved in the sessions with the Child, and in order to involve Mother with the Child she would have to prepare and meet with Mother individually before they became joint sessions. She opined the Child needs permanency and stability and that he is in a loyalty bind between the multiple caregivers in his life. (N.T., 5/30/2017, p.25 at 8-25; p.26 at 1-17).

On cross-examination by Ms. Dooley, Mother's attorney, Ms. Cotton, noted the Child was actively involved in treatment with her many years for molestation, in which Mother was not involved. She was aware Mother and Child had unsupervised weekend visits since he was eight months old and Mother was fifteen years old, and that the visitation was modified to supervised visits about one year ago. She further noted she

16

was not aware that Mother and her paramour were engaged in relationship therapy. However, she did know that Mother had recently completed a Bonding Evaluation. (N.T., 5/30/2017, p.27 at 1-25; p.28 at 1-12).

Ms. Cotton testified the Child does want to see his Mother, however, he has expressed that he enjoys the supervised visits with Mother in the room because it is less moving around and he enjoys playing in a stable environment. (N.T., 5/30/2017, p.28 at 13-17; p.29 at 6-15).

Mother was the next witness to testify. She related a different accounting of the incident with Ms. Mowatt at the elevator after the last court hearing. She claims she did approach her at the elevator and merely asked what was going on with the case, and Ms. Mowatt responded by telling her to get out of her face, and told the other person that she was threatening her. Mother denied threatening Ms. Mowatt. She did state she has been asking for her to be removed from the case, however, her Supervisor denied the request multiple times. She asked for Ms. Mowatt's removal because she was never able to get in contact with her, and would not respond in a timely manner. When she did respond it was always with aggression or attitude towards her. (N.T., 5/30/2017, p.30 at 5-25; p.31 at 5-24).

Mother further testified she began bi-weekly relationship therapy with her paramour in March 2017 at GPHA, and gave that information to Ms. Mowatt. Mother denied telling the Child he was fat, but instead told him he looked very good and had gained weight. She stated he looked very healthy and well and she was appreciating that the foster parent was treating him properly. (N.T., 5/30/2017, p.32 at 1-25; p.33 at 1-24).

Mother stated she does not want her visits terminated, and instead wants to return to the unsupervised visits. She claims to have done everything requested by the Agency and in fact, has gone beyond what was necessary. Lastly, Mother stated she was confused about the results of the last hearing and was the reason she approached Ms. Mowatt. Mother apologized if she came off as aggressive towards her. Lastly, Mother presented the Court with a letter from her therapist dated April 7, 2017, verifying that she and her paramour were attending therapy at GPHS Woodland Ave. (N.T., 5/30/2017, p. 34 at 7-20; p.35 at 3-12; p.37 at 14-24).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

Our standard of review for dependency cases is as follows: [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion. In re R.J.T., 608 Pa. 9, 26–27, 9 A.3d 1179, 1190 (2010) (citations omitted).

### Trial Court Properly Restricted Mother's Visitation with the Child Pursuant to 42 Pa.C.S.A. § 6351 (e) (3) (ii) (D)[1]

---

[1]§ 6351. Disposition of dependent child

**(e) Permanency hearings.--**
(1) The court shall conduct a permanency hearing for the purpose of determining
or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's

18

DHS requested an Emergency relist for a hearing on April 27, 2017 seeking a stay-away-order against Mother to protect the CUA Case Manager, Jazzmine Mowatt, and a change in visits between Mother and Child. This hearing request was approved by the Court on May 4, 2017, and the case was listed for a Status Review Hearing on May 11, 2017.

This Child became known to DHS in March 2010, when he was approximately eight months old. The Child and Mother, who was fifteen years old at the time, were

---

desired permanency goal, in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court.

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).

**(3) The court shall conduct permanency hearings as follows:**

(i) Within six months of:

(A) the date of the child's removal from the child's parent, guardian or custodian for placement under section 6324 (relating to taking into custody) or 6332 or pursuant to a transfer of temporary legal custody or other disposition under subsection (a)(2), whichever is the earliest; or

(B) each previous permanency hearing until the child is returned to the child's parent, guardian or custodian or removed from the jurisdiction of the court.

**(ii) Within 30 days of:**

(A) an adjudication of dependency at which the court determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made;

(B) a permanency hearing at which the court determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made and the permanency plan for the child is incomplete or inconsistent with the court's determination;

(C) an allegation that aggravated circumstances exist regarding a child who has been adjudicated dependent, filed under section 6334(b) (relating to petition); or

**(D) a petition alleging that the hearing is necessary to protect the safety or physical, mental or moral welfare of a dependent child.**

placed at the People's Emergency Shelter. Mother then left the Child at the Shelter in the care of another teen resident, and stated she was going to school. DHS then issued an OPC for the Child and placed him in a foster care home through Catholic Social Services. On March 26, 2010, the Court adjudicated the Child dependent and committed to DHS, with Child at Catholic Social Services Foster Home, based on present inability of Mother to complete parenting and therapy. Mother began unsupervised overnight visits with Child as arranged by the parties at the Shelter. The Child is now eight years old and continues under court supervision and in foster care.

The standard in evaluating frequency of visitation is based on the best interest of the Child. *In re Long*, 313 Pa.Super. 47, 459 A.2d 403 (1983); *In re E.F.V.*, 315 Pa.Super. 246, 461 A.2d. 1263 (1983). As a usual rule, parental visitation is not denied except where a grave threat to the Child can be shown. The policy underlying the "grave threat" standard reflects the desirability of continuing contact between the parent and child. It underscores the importance of each parent's maintain a meaningful and sustaining relationship with the Child. The "grave threat" to the Child standard is applied to visitation both where the Child is in custody of a natural parent and where the Child is in foster care and in the custody of the state.

On appeal, Mother alleges the Court erred by suspending Mother's visits with her Child, when there was no evidence or testimony that there was a grave threat to the Child. This Court agrees with Mother that no evidence was presented that Mother posed a "grave threat" to her Child. This Court, however, disagrees that the "grave threat" standard applied to this case. This Court instead, relied on the "best interests of the Child" standard to temporarily suspend Mother's visits.

20

This Court ordered a temporary restriction of Mother's visits, until she could be integrated into therapeutic visits as soon as they can be arranged by Janet Cotton, Trauma Therapist. The Court relied on credible testimony by Ms. Cotton regarding concerns related to Mother's visitations and recommended that visits cease at this time. Ms. Cotton testified that since the Child's visit with Mother the first weekend in May, the Child has also been experiencing some self-esteem issues because Mother referred to him as being fat and spoiled. He has also been exhibiting risk-taking behaviors such as self-harming, hanging out of a car window, going face first down a flight of stairs, and shoving tissues so far up his nose that it is damaging his mucus membranes.

She opined that she has never seen this behavior in the Child in the years she has treated him, and believes the visits with Mother are a threat to the Child's emotional and physical safety at this time. The Child also attended a psychiatric evaluation recently, and CTSS stabilization services were requested to have someone come out to the foster home and help stabilize him. She further recommended the Child be placed on medication management, however, was concerned that Mother may be unwilling to sign for the medications, as she has done in the past.

Based on the trauma therapist's testimony and her continued treatment history with the Child of many years, and also on the evidence relating to the Child's best interest, including, but not limited to the: 1) length of separation from Mother; 2) effect of visitation on the Child; 3) the age, sex and health of the Child; 4) the emotional relationship between the Child and Mother; 5) the special needs of the Child; and 6) the effect on the Child's relationship with the current caregiver, this Court concluded that it would be in the Child's best interest for Ms. Cotton to incorporate Mother into the

Child's therapy sessions and temporarily suspend Mother's supervised line of sight/hearing visits with the Child at the Agency.

## Due Process and Equal Protection Under the Law

Mother's other argument is that she was denied due process and equal protection under the law as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and the United States. This broad assertion does not state the basis of the denial of her due process and equal protection rights, and this Court cannot speculate what Mother's allegations are. The Court does state that Mother was never denied the opportunity to participate, testify, and present evidence on her own behalf. She participated in the permanency review hearing and also testified. Her attorney was also present at the hearing and presented evidence on her behalf. Accordingly, Mother was never denied a fair and impartial hearing.

## CONCLUSION:

At the conclusion of the hearing the Court stated:

> As a matter of finding of the Court, the credibility issue, because the stories are different, I believe the case worker and the Mother's story and her fiancé story do not match and it lacks credibility. There will be a stay away order entered on behalf of the case worker against the Mother. And, I am going to suspend the visitation. And, I am going to continue the path of the therapy with the Child, and the visitation when resumed at the recommendation of the therapist, shall be therapeutic visitations.
>
> I believe that the fact supported finding, that the unsupervised, untherapeutic visitation is

not in the best interest of the Child. And, in fact, is causing the Child to regress. And that the story that Mother offers about having the contact with the case worker immediately after having had a full hearing is not credible. I believe that the aggression did take place. As it frequently is in these cases, the parents blame the agencies and blame the case workers who work for the agencies for the lack of completion of goals and the lack of advancement towards reunification.

I quite honestly find it almost unbelievable that the Child has been in placement so long, but I understand that we are on a path to present more predictability and stability for the Child and I'll allow that to work out through the agency. But, I restate to the parent, to Mother, that everyone in the room is here to help you be reunified with your Child. I think your difficulty is that you're in denial as to certain things and you're unable to perceive that we're here to help you.

That frequently is the case because there are aggressive behaviors that are directed at case workers and the aggression is misplaced. She has got to learn to communicate. Physical stay away order. She may continue to communicate with the case worker. And the communication as I see it will be advanced through the therapeutic visitation. Most of the contact will be through the therapist.

She [case worker] may communicate with Mother, but there is just no physical, no contact order. She has the ability to email. Of course, the best means of communication should be something that we have a record of and that would be email.

The visits are therapeutic visits as soon as that can be arranged. Right, I am not cutting them off. I am just restricting them and allowing the therapist who is developing a relationship. Mom, again, I believe your aggressiveness is misplaced. The only reason that we exist is to try and keep families together, not break them apart and you have to realize that. And it's not the case worker that brought the Child into care. You brought the Child into care because of your behavior.

23

I am very familiar with the case. Eight years is a long time. She's one of the luckiest persons in this system. That her rights have not been terminated yet, but she's jeopardizing that position with the Court. I want the therapist to continue and to incorporate Mother when appropriate, whatever the language of the order has to be.

(N.T., 5/30/2017, p.42 at 5-25; p.43 at 1-25; p.44 at 3-21; p.45 at 10-17; p.46 at 15-25; p.47 at 1-24; p.48 at 8-11).

For the foregoing reasons, this Court respectfully requests that the Order of May 30, 2017, suspending Mother's supervised line of vision/sight visits with the Child until the therapist incorporates Mother into the Child's trauma therapy be AFFIRMED.

**BY THE COURT:**

_Tereshko_
**ALLAN L. TERESHKO, Sr. J.**

_8-17-17_
**DATE**

24